Catherine FLORA, Dorothy Westmoreland, Dorothy Copeland, Leola Gladney, and Mary Herrod, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Jimmy MOORE, Individually and as Administrator of Calhoun County Hospital, Glennie Harrellson, Individually and as Executive Housekeeper of Calhoun County Hospital, Johnnie Baker, Individually and as Director of Nursing Service of Calhoun County Hospital, and the Calhoun County Hospital, their agents, employees, successors and assigns, Defendants.

No. WC 77–29–K.

United States District Court,
N. D. Mississippi, W. D.

Dec. 8, 1978.

Alvin O. Chambliss, Jr., Oxford, Miss., for plaintiffs.

E. Grady Jolly and Judith J. Johnson, Jackson, Miss., for defendants.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

On March 25, 1977, plaintiffs Catherine Flora, Dorothy Westmoreland, Dorothy Copeland, Leola Gladney and Mary Herrod instituted this employment discrimination suit against defendants Calhoun County Hospital, Jimmy Moore, individually and as Hospital Administrator, Glennie Harrellson, individually and as Executive Hospital Housekeeper, and Johnnie Baker, individually and as Director of Hospital Nursing Service, seeking redress on account of racial discrimination practiced by the defendants toward the named plaintiffs and all members of a purported plaintiff class consisting of black and female persons who were formerly, are presently, or might in the future be employed by the Calhoun County Hospital. Federal jurisdiction was principally invoked under 28 U.S.C. § 1343 for causes of action arising under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. §§ 1981, 1983 and 1988; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Other statutes and authority relied upon by plaintiffs include

Titles VII and VIII, 42 U.S.C. § 292 et seq., § 296 et seq., of the Public Health Service Act of 1944 as amended; Executive Order 11246 as amended, 3 C.F.R. 339 et seq.; 29 U.S.C. § 206(d) of the Fair Labor Standards Act; and 29 U.S.C. § 794, § 504 of the Rehabilitation Act of 1973, as well as the thirteenth and fourteenth amendments. The defendants, by joint answer, denied all charges of racial and sex discrimination alleged in the complaint and also challenged that the case was maintainable as a class action.

On March 16, 1978, the court reviewed the sufficiency of the proceedings by the named plaintiffs and their counsel, or lack of affirmative steps to prosecute a Rule 23 action, to ascertain if the suit qualified as a class action and concluded that the named plaintiffs had failed to prosecute the interests of the putative class and were, therefore, inadequate class representatives for the reason detailed in a Memorandum Order. *Flora v. Moore,* 78 F.R.D. 358 (N.D. Miss.1978).[1]

After protracted discovery, a pretrial conference was conducted by the United States Magistrate on July 14, 1978, when various stipulations of fact were made. A five-day evidentiary hearing before the court commenced October 18, with oral and documentary evidence adduced by both sides. Notwithstanding the court's previous order that the action was only on behalf of the individual claims of the five named plaintiffs, counsel for plaintiffs sought to offer evidence in support of class action allegations, much of which was excluded as not germane to the issues raised in the present litigation. The court, having called for memorandum briefs and having maturely considered the case, now proceeds to make findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P.

## I. FINDINGS OF FACT

(a) Background facts.

Calhoun County Hospital, a 50-bed facility, is located in the Town of Pittsboro in Calhoun County, Mississippi. It was originally built and owned by the late Dr. O. B. Crocker and was operated as his private institution at all times relevant to this action. Following the death of Dr. Crocker, the hospital facility was, in October 1977, purchased by the Town of Pittsboro; thereafter it has been operated as a public hospital under a long-term management contract made with an organization known as Medenco, Inc. The hospital has been renamed the Calhoun County Medical Facility. At all relevant times both prior to and since it has become a public hospital, the facility has received financial assistance under the Medicare and Medicaid programs. Approximately 55% of the patient load is Medicare-eligible, while 11% of the patients are on Medicaid. During Dr. Crocker's lifetime, he and two other physicians constituted the hospital's medical staff. On February 17, 1972, Jimmy Moore was employed by Dr.

1. Plaintiffs on July 21, 1978, unsuccessfully sought to renew their motion for class certification. Despite the fact that the court found that inadequacy of representation was not subject to reconsideration, counsel for plaintiffs nevertheless persisted with continuing appeals to have the case so certified. Such efforts were rejected by the court on October 12, which was on the eve of the evidentiary hearing and the plaintiffs were expressly ordered to proceed on their individual claims. Again, during the evidentiary hearing of the individual cases, counsel for plaintiffs, at the beginning of the evidence and again at the close, unsuccessfully sought to have the case certified as a Rule 23(b)(2) class action. Indeed, in their zeal for class action certification, plaintiffs' counsel offered minimal proof in support of the individual claims of the named plaintiffs. It should be stated that the court's action denying certification in the instant case is without prejudice to the members of any putative class because of the fact that a separate suit against Calhoun County Medical Facility (formerly known as Calhoun County Hospital) and Tom Faith, Administrator, has been brought by Ada G. Corbitt on behalf of herself and all others similarly situated Cause No. WC 78–62–K–P, as "an across the board" employee discrimination action on account of race and sex. The court, in this companion action, has extended the time until January 29, 1979, for discovery in support of plaintiffs' motion for class certification. Manifestly, no prejudice may accrue to any member of the putative plaintiff class because plaintiffs here have been found to be inadequate to represent the class.

Crocker as the hospital administrator; he served in that capacity until the hospital passed into public ownership. Ms. Johnnie Baker, a registered nurse, was and still is the superintendent or director of the nursing staff, consisting of nurses, nurses' aides and orderlies, who work in three eight-hour shifts; the size of the nursing staff varied at times but at trial consisted of 41 persons, including the nurse director. Ms. Glennie Harrellson, wife of Arlis Harrellson, Dr. Crocker's nephew, was at all relevant times employed as supervisor of the cleaning staff, having under her direction all maids and porters employed by the hospital. Arlis Harrellson was also employed by Dr. Crocker as purchasing agent, but he had no supervisory authority over any employees.[2] In charge of hospital food services was Ms. Nettie B. Crocker, a sister-in-law of Dr. Crocker; working under her direction was Ms. Hazel Snellings, another Crocker relative, who served as kitchen supervisor. Ms. Snellings directed the work of all hospital cooks employed on different shifts.

(b) Individual claims of four named plaintiffs formerly employed as maids.

Dorothy Westmoreland, Dorothy Copeland, Leola Gladney and Mary Herrod had each applied for and accepted positions as maids at the hospital, Ms. Copeland being hired in 1956, Ms. Herrod in December 1972, Ms. Gladney in September 1973, and Ms. Westmoreland in August 1975. None of the plaintiffs ever requested a promotion, and during their entire terms of employment served as hospital maids and in August 1977, which was prior to Dr. Crocker's death, worked under the directions of Ms. Harrellson. These four plaintiffs, together with three other black maids and two porters, one black and one white, constituted the hospital's cleaning crew. They had been traditionally assigned the duty of cleaning the patient rooms, baths, waiting rooms, halls, administrative rooms and all areas except the operating suite, including

the delivery room. The cleaning force was divided into two shifts, one called the day shift which worked from 7 a. m. to 3 p. m., the other the night shift working from 3 to 11 p. m. No maids or porters were on duty from 11 p. m. to 7 a. m.; any cleanup work during that period of time (other than the operating suite and the delivery room) was handled by the morning shift which came on duty at 7 a. m. The operating suite, including the delivery room, had always been cleaned by the nurses, nurses' aides and orderlies on their respective shifts.

(c) The genesis of the dispute regarding the plaintiff maids.

During the month of July, a decision was jointly made by the medical staff, Ms. Baker as director of nursing services, and Administrator Moore to train the maids and porters to clean the delivery room and to assign that duty to the night shift of the maids and porters so that each maid, and a porter on occasions, would have that task to perform once a week. The reason which defendants ascribed for this decision was the shortage confronting the hospital in its staff of nurses, nurses' aides and orderlies. The 3 to 11 p. m. nurses' shift was deployed as follows: when a delivery occurred, one nurse was required to attend the mother, another was required to attend the baby, at least one, if not two nurses, was needed to man the emergency room, and two nurses were required to be at the nursing stations with a nurse supervisor in charge. Emergency surgical cases necessitated surgical nurses to assist the surgeon. Included in the nursing staff were two blacks, Ms. Grace Stevens, a surgical nurse's aide, and Zeddie Brownlee, a surgical orderly. Prior to this decision for the delivery room to be cleaned by the maids, or porter, on night duty, the nursing staff on the 3 to 11 p. m. shift, which frequently included whites as well as blacks, had routinely cleaned the delivery room, together with all areas of the operating suite. The decision, however, was that although maids or porters should

---

**2.** At time of trial, Harrellson was an invalid, confined to a wheelchair, and did not appear as a witness.

not be allowed to enter the operating suite, they were capable of being trained to proficiently clean the delivery room; and, to that extent, they could relieve the overburdened nursing staff during the night shift. Ms. Harrellson was directed by Ms. Baker to notify the maids and porters of this added responsibility and to advise they would be trained to properly clean the delivery room. It was reliably estimated that cleaning the delivery room was an assignment requiring approximately 30 minutes, but that cleaning of the delivery room would not be required every night since it was not used that often. By undisputed proof, only 66 babies were born during the whole of the calendar year 1976, and after August 17 of that year—the date on which plaintiff maids ceased to work for the hospital—only 7 babies were born during the 3 to 11 shift for the remainder of the calendar year, or through December 31, 1976.

### (d) Controversy with plaintiff maids.

Ms. Harrellson was directed to notify all maids and the two porters of their new responsibility when on the night shift and to arrange for their training. When Ms. Harrellson mentioned this subject to the maids, some, including the plaintiffs, complained that they could not do the work unless they were relieved of other duties. In any event, the matter came to a head when Ms. Baker inquired of the plaintiff Dorothy Copeland on or about August 14 why she had failed to clean the delivery room which had been used during the 3 to 11 shift while Ms. Copeland was on duty. Ms. Copeland told Ms. Baker that she had not received such instructions from Ms. Harrellson, her supervisor. Ms. Baker immediately contacted Ms. Harrellson to determine why the orders had not been carried out. This occurred on the night of Saturday, August 14. The following Tuesday, August 17, the black maids, Ms. Copeland, Ms. Westmoreland and Ms. Gladney (plaintiff Ms. Herrod being absent), as well as the two porters, Ottis Wayne Tapley, white, and James Armstrong, black, were summoned to the dining room by Mr. Moore, where he advised them that they would be offered training to clean the delivery room and they would be expected to clean that area one night a week, if the need arose, while working the 3 to 11 shift. A factual dispute arose as to the positions taken by Moore and the three plaintiff maids, together with Ms. Herrod, who, although not at the meeting, decided to join them in leaving the hospital when she was advised as to the report of the meeting. In their charges filed with EEOC, the plaintiff maids indicated that they were ordered to do work for which they were not qualified and that they refused to clean the delivery room because they felt the duty assigned to them was because they were of the black race.[3] In their depositions and testimony before this court, however, the plaintiff

---

**3.** Dorothy Westmoreland's charge reads as follows:

I was ordered to do work that I was not qualified to do, nor supposed to do such as cleaning the delivery room, which is done by nurses aids. at night, I did the work of 3 day time employees without receiving extra night pay to which I was entitled. These and other poor work conditions was directed toward me, in my belief, because of my race Black.

Leola Gladney's charge reads as follows:

I was given work to do that I was not qualified to do it was work for nurses and nurses aids. When I did not do it, I was fired from my job. At night, I did the work of 3 day maids without more money. I feel that the extra work and poor work conditions were added to harass me because I am Black. I believe that the change in work conditions was done to force me and other Blacks off the job.

Dorothy Copeland's charge reads as follows:
The conditions that I had to work under were discriminatory. I was asked to do work that I was not qualified to do nor able to do. Additional work was given me at night. I did the work of several day maids without additional compensation. I was told to leave the job if the conditions had become too unpleasant. I feel that the worsening conditions were done to force me and other Blacks out.

Mary Herrod's charge reads as follows:
I was ordered to do work that I did not have the skill to do—such as cleaning the delivery room. That type of work is done by nurses aids. At night, I did the work of several day maids by myself. When I protested the work conditions I was fired from my job. I believe that these things were done to harass me because I am.Black.

maids contended that the reason for their declining to accept the duty of cleaning the delivery room was that they did not have time to do so unless they were relieved of other work. They denied that Moore gave them the reasons for the decision or offered training, stating that he peremptorily told them to clean the delivery room or else "hit the clock." They adhered, however, to a belief that they were being asked to perform the additional work of cleaning the delivery room because they were black. The court rejects their trial testimony as incredible, for the training which Moore said would be provided was an absolute necessity for one to work in the delivery room. None of the plaintiff maids inquired as to how long it would take to clean the delivery room, what was involved in the procedure, or how frequently the duty would probably have to be performed. The time needed to perform the seldom required duty was quite reasonable and did not justify plaintiffs' peremptory rejection. We credit Moore's testimony as accurately stating the facts. In a memorandum prepared that very day, as set forth below, a true account was given as to the sequence of events at the meeting.[4] When the three plaintiffs who were present, after being offered training to clean the delivery rooms, told Moore that they could not do it, Moore stated that they would either carry out his orders or their jobs would be terminated. The plaintiffs, including Ms. Herrod,[5] who were former maids, elected not to

4. Moore's memorandum dated August 17, 1976, to the Personnel File of three of the plaintiff maids reads as follows:

> On Tuesday, 8/17/76, a meeting was held in the dining room with Dorothy Copeland, Mandy Brandon, Leola Gladney, Dorothy Westmoreland, Ottis Wayne Tapley, and James Armstrong.
>
> The purpose of the meeting was to stress the importance of performing assigned tasks that were previously directed by Mrs. Glennie Harrellson.
>
> During the past few weeks the patient load of this hospital had decreased considerably. Due to vacations being scheduled in Nursing Service, it has become imperative that previously assigned tasks of Nursing Service be delegated to the Housekeeping Department. After much deliberation it was decided that the 3-11 shift of Housekeeping could better clean the delivery suite after each delivery rather than the aides in Nursing Service. Several attempts were made to provide in-service training to the Housekeeping personnel. However, no settlement was made between the prospective department heads and certain maids.
>
> At approximately 10:30 AM I requested Mrs. Harrellson to group Dorothy Copeland, Mandy Brandon, Leola Gladney, Dorothy Westmoreland, Ottis Wayne Tapley, and James Armstrong in the dining room so that I could better understand their reasoning for refusing to perform their assigned tasks.
>
> All of the maids and porters who were on duty attended the meeting whereby, several attempts were made to convince them that there was a great need for their services in cleaning the delivery suite. After a lengthy discussion I repeated we would expect them to perform their assigned tasks if they planned to continue to work at Calhoun County Hospital. They, Dorothy Copeland, Mandy Brandon, Leola Gladney, Dorothy Westmoreland, Ottis Wayne Tapley, and James Armstrong, individually and collectively refused to accept this change in their duties and consequently walked out of the hospital.
>
> This incident created undue, unbearable, and unjust disruptions from the organizational structure of the hospital.
>
> See EEOC file, Pltf. Ex. 2.

5. Ms. Harrellson, on August 20, 1976, prepared a memorandum of her contact with Mary Herrod and her response for refusing to return to work, as follows:

> Mary Herrod was scheduled to work 3:00PM to 11:00PM on Tuesday 8/17/76, but did not report for duty at the appointed time. She had not called me to report and illness, accident, or other reason for her abscence. After 3:00PM I called her at home and asked if she was coming to work. She gave me no explanation for not coming to work but told me she was going to town and planned to come by the hospital to see the doctor and would come by to talk with me. She did not come before I left the hospital for the day.
>
> On the morning of 8/18/76 I again called Mary Herrod at home and asked why she did not contact me. She still gave no explanation for not coming but said she "wanted to talk with the rest" before talking with me. I assumed she had reference to the walk out of maids on duty 8:00AM to 4:))PM on 8/17/76 and reminded her that I felt everyone should speak for themself and that I needed to know whether or not she planned to return to work as scheduled 8/19/76. She said "NO", she would not be back.
>
> See EEOC file, Pltf. Ex. 2.

accept the training and left the job on their own accord following the meeting with Moore on August 17, 1976. None has since worked for the hospital.

Porters Tapley and Armstrong remained on the job, and other blacks were hired as maids to replace the departed plaintiffs. All such persons received adequate training for cleaning the delivery room and thereafter performed the cleaning task, whenever needed, one night each week during the 3 to 11 shift. The undisputed evidence was that at all times except when the maids were to clean the delivery room during the 3 to 11 shift, should the occasion arise for such cleaning, the cleaning of the delivery room was always performed by the nursing staff, which included both white and black nurses, nurses' aides and orderlies. The evidence further shows, and the court finds as a fact, that cleaning the labor-delivery room, as set forth in a procedure approved by Ms. Baker, involved bagging the soiled linen, picking up trash, mopping the floor, sponging the tables, taking out syringes, etc., used by doctors, a task which the average maid could be easily trained to do proficiently within 30 minutes.

    (e) The dispute as to the plaintiff Catherine Flora who was employed as a cook.

Catherine Flora had been employed by the hospital from August 1965 until August 1976, and under the hospital rules was entitled, because of her long tenure, to three weeks' vacation with pay. Ms. Nettie Crocker was her supervisor. During early August, at Ms. Crocker's request, she went to see Moore regarding the time for her vacation; and he gave his approval for her to take it beginning September 1. Later Ms. Crocker countermanded this date by stating that because of illness of cooks and dietary personnel no vacations could be taken for the next five weeks. This conversation occurred about mid-August. The undisputed evidence shows that at that time Ms. Snellings, the kitchen supervisor, had been notified by Dr. Crocker that because of a lump in her breast she would have to undergo surgery, and did so. Two head cooks normally on duty, Ted Barns and Mary Gunn, were both off work because of illness. Also, Nancy McNannee, a part-time cook, had major surgery and was off work for several weeks. Despite this emergency condition existing in the kitchen and the great need for Ms. Flora to delay her vacation, plaintiff Flora objected to any postponement of her vacation. Instead, she failed to report to work on August 23, 1976, and has not since worked at the hospital. The proof wholly fails to sustain her charge made to EEOC.[6] On the contrary, she left the job on her own accord, piqued because her vacation plans were interfered with. She was not subjected to harassment by Ms. Crocker, who acted reasonably under the circumstances, and was in no way motivated by consideration of race in requesting this plaintiff to postpone her vacation for awhile.

    (f) The bizarre conduct of Arlis Harrellson.

Plaintiffs complained of the behavior of Harrellson, the purchasing agent, because of his rude and uncivil conduct toward them as maids, and they felt that his crude deportment was motivated because of their race. The purchasing agent appeared

**6.** Plaintiff Flora's charge reads as follows:

The company discriminates against identifiable aggrieved parties and against the class they represent—all present, past and potential Black employees, both male and female—by way of their policies and practices regarding hiring, recruitment, promotion, termination, layoff, intimidation, reprisals and in the terms and conditions, including but not limited to the assignment of work hours and cooperation in the enhancement of educational improvement. Different treatment of Blacks from that of whites worked a hardship on Blacks in the kitchen as well as in other departments at the hospital. Intimidation and other pressures were applied to me and other Blacks. Privileges were given to whites but were denied to Blacks. I was fired because of my race and for protesting an unfair labor practice prohibited by Title VII. The harassment by the employer was calculated to force me and other Blacks similarly situated to quit our jobs; thus, constructive termination occurred.

prominently in their trial testimony as each of the plaintiff maids testified that Harrellson, in charge of the supply room, whenever they would bring their carts to the room and ask him for supplies, would drop them on the floor rather than hand them to the plaintiffs. Frequently, when they were taking a break and gathered in the utility room, Harrellson would pass down the corridor and kick the door open with his foot; on at least one occasion he kicked open the door to a bathroom in use. Plaintiffs testified that, although Harrellson was not their supervisor, he nevertheless "bossed" a lot of things at the hospital, stating that on occasions when federal or state inspectors were due to visit the hospital, Harrellson would direct them to scatter over the dining room area and not congregate at separate tables, as was their custom. The maids complained to Administrator Moore about Harrellson's behavior, which persisted for a period of some years. The evidence convinces us that Harrellson was indeed a "privileged character" as Dr. Crocker's nephew. According to Moore's testimony, he treated blacks and whites alike rudely and inconsiderately. Moore, in fact, complained to Dr. Crocker without success to have Harrellson, who had no authority over any of the hospital employees and was merely a purchasing agent, to mend his ways, for Harrellson unquestionably constituted somewhat of a problem to the entire hospital administration. Moore did explain that the carts of the nurses were smaller than the maids' carts and the former could get through the door into the supply room; that while on some occasions Harrellson placed the supplies on nurses' carts, he was most particular in making no contact with anyone by hand. Undoubtedly, Harrellson was a hypochondriac, with a morbid concern about physical disease, for, according to Moore, he used his foot, rather than his hand, to open a door whenever possible. It was Harrellson's practice to kick open the door to enter the administrator's office. He preferred to use the restroom annexed to the conference room because the door had no knob and it could be easily kicked open. Harrellson was an habitual hair comber and hand washer; he washed his hands ten to fifteen times a day. A partial explanation of his bizarre behavior may arise from the fact that three ligaments of his right hand were drawn, and he frequently expressed fear that things he might touch would contaminate him. Unquestionably, Harrellson was abrupt and rude to all hospital employees, from the administrator on down; he would make sly remarks about all, and assuredly made no distinction between black and white employees in his mode of treating other human beings. White employees, no less than black employees, complained to Moore about Harrellson's deportment, but because of Dr. Crocker's unwillingness to remove his nephew from the hospital—as undoubtedly should have been done—Moore's administration had to tolerate the odd behavior of this person.

(g) Other working conditions.

Factual dispute exists with respect to certain working conditions about which the plaintiffs complained to EEOC and testified at trial, but they clearly had no causal connection with their termination as hospital employees. For example, plaintiff maids and other witnesses testified that the maids ate at a separate table, apart from the white nursing staff. This proof was rebutted by evidence from Moore that the hospital had no policy for blacks to eat at separate tables from whites in the dining room. On the contrary, he testified, and the court finds, that one or more tables were occupied by the nursing staff, consisting of both black and white employees, and that the service force, including the maids, consistently ate together at another table. This came about altogether by free choice of the employees. Moore emphasized that a person was free to eat at any table of his choice, but that the hospital personnel did informally congregate at tables according to their interests and job occupations. To illustrate, the integrated nursing staff usually dined at one table, while the service employees used another table. In no respect, however, Moore testified, was the dining room operated on a segregated basis.

The court finds this testimony as reasonable and more credible considering all of the circumstances and the natural tendency of persons having like interests to group together.

Another complaint of the plaintiffs and other black employees was that on the west hall of the hospital there were three bathrooms, one marked "private," a second for men, and a third with no designation. Plaintiffs testified that the white personnel used the bathroom marked "private," but the black female employees used the unmarked bathroom. In the unmarked bathroom, plaintiffs complained that there was no water in the shower, and that they had to share lockers; that white personnel, using the bath marked "private," had shower facilities and were provided individual lockers. Plaintiffs further stated that whites never used the bathroom which was fre012quented by the black service personnel, although the bathrooms were located side by side. When facilities in the unmarked bathroom were inoperable, the maids would use bathrooms in unused patient rooms. The rebuttal evidence was that the nursing staff, both white and black, were accustomed to using the same bathroom, that the men's room was used by both physicians and white and black male employees. Moore testified that there was no segregation in the use of bathroom facilities; that the hospital had twelve to fourteen bathrooms, exclusive of patient rooms, and none was restricted to use by persons of one race. He emphasized that there was no prohibition whatever on the use of any bathroom; and that he was unaware that any restroom had, through informal usage, become segregated because of race. He explained the designation of "private" on the one bathroom by stating it was an architectural mislabel and that, to his knowledge, black female employees have used all bathrooms available for women.

Other complaints brought forward by plaintiffs were the lack of promotion opportunities available to black employees who had long tenure at the hospital and that patients in the semi-private rooms tended to be segregated according to race. Plaintiffs gave testimony that on several occasions, when it was made known that state and federal inspectors were to view the hospital, patients would be rearranged to show a racial mix. This latter practice was denied by Moore as well as Johnnie Baker, who testified that the hospital, which had both private and semi-private rooms, was integrated insofar as patients were concerned. As for staff assignments, Ms. Baker stated that no black registered nurse had ever applied to work at the hospital, but that she had employed black licensed practical nurses, black nurses' aides, and black orderlies who formed a part of the overall nursing staff, and that blacks were at all times on the roster of her nursing personnel.

(h) EEOC findings.

The record shows that EEOC made findings in the case of each of the five named plaintiffs of no reasonable cause to credit the charges as alleged and issued notice of right to sue letters. In the case of the four maids, the determination letter of Charles A. Haycraft, EEOC District Director, concluded as follows:

Respondent, a privately owned and operated Community Hospital, is engaged in providing Medical services to its patients. Respondent employs approximately 81 persons, 18 (22%) of whom are Black and 68 (84 percent) of whom are female. Respondent's facility is situated in a county which is 26 percent Black.

It is undisputed that during July or August of 1976, management made a decision to reassign the duty of cleaning the delivery room to the night maid on duty. Prior to this decision, nurse aides on night duty had performed this task. It is also undisputed that Charging Parties collectively chose to terminate their employment rather than accept this new assignment.

Charging Parties allege that they were forced to terminate their employment as Respondent reassigned this task to the Black maids rather than have White Nurse Aides perform it.

Respondent Administrator denies the charge and states that Charging Parties voluntarily chose termination rather than accept an administrative decision which was necessitated by a reduction in patient load and a reduction in its nurse aide staff. He indicated that the reassignment was in an attempt to keep a full time staff and had no racial implications. There is no evidence of record or testimony that the reassignment of delivery room cleaning duties was due to the racial make up of Respondent's maid and nurse aide workforce as Whites and Blacks on the day shift both perform this task; nor is there evidence of record that Respondent would not have reassigned this task even if its maid workforce had been or contained White workers, or that Whites would not have been similarly terminated or given the option to accept or reject the reassigned duty. Accordingly, we do not find a reasonable basis for crediting the charge as alleged.

In the case of plaintiff Flora, the determination letter stated as follows:

Charging Party alleges that she was discharged because of her race (Black). She also alleges that Blacks as a class are discriminated against in terms of privileges, promotion, hiring and recruitment, layoff, intimidation and reprisal, assignment, and educational opportunities in violation Title VII of the Civil Rights Act. It is undisputed that Charging Party worked for Respondent's Hospital part-time prior to her hire to full time employment in May of 1974, and that Charging Party was separated from Respondent's employment in August of 1976.

Charging Party contends that her termination was forced due to continued intimidation and harassment by her supervisor and the fact that she was denied the vacation period she requested in favor of a White.

Respondent officials deny the charge and state that Charging Party voluntarily quit when asked to delay the second part of her vacation due to a shortage in kitchen personnel.

Evidence of record does not support Charging Party's contention that she was denied her requested vacation period in favor of the subject White employee as the record shows the White employee had been scheduled and took her vacation prior to the time requested by Charging Party. Also evidence does not support the charge that Charging Party was selected by the supervisor for unusual and severe intimidation and harassment.

Further, Charging Party acknowledges that she did not return to work of her own accord after she was denied the vacation period she requested.

Accordingly, we do not find a reasonable basis for crediting the charge, as alleged.

EEOC was of the view, however, that if the hospital maintained separate and racially identifiable facilities, such as restrooms, whether through custom and usage, freedom of choice or whatever, such a practice would be to segregate employees because of their race within the meaning of § 703(a) of Title VII. The agency concluded that on the evidence presented, the hospital did maintain racially segregated restroom facilities in violation of Title VII.

## II. CONCLUSIONS OF LAW

The court has unquestioned jurisdiction over this controversy under 28 U.S.C. § 1343 for causes of action arising under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq., as well as the 1866 Civil Rights Statute, 42 U.S.C. § 1981. The five plaintiffs duly filed charges of racial discrimination with the Equal Employment Opportunity Commission (EEOC); after that agency determined no reasonable cause, it issued right to sue letters, and the instant action was brought within the time limitations of Title VII. Thus, all jurisdictional prerequisites for a Title VII suit have been satisfied. It is equally clear that 42 U.S.C. § 1981 exists as a separate, independent right of action for plaintiffs to seek redress for acts of private discrimination allegedly committed against them on account of race.

Some of the other jurisdictional bases invoked by plaintiffs, however, are

clearly without merit. For example, jurisdiction may not attach under 42 U.S.C. § 1983 because at all times relevant to this action Calhoun County Hospital was a private institution, thus lacking the essential ingredient of "state action" required to make out a case under § 1983. See, *e. g., Golden v. Biscayne Bay Yacht Club,* 530 F.2d 16 (5 Cir. 1976) (en banc), *cert. denied* 429 U.S. 872, 97 S.Ct. 186, 50 L.Ed.2d 152 (1976). Neither does § 1988 provide an independent cause of action but merely grants a remedy to plaintiffs for the redress of civil rights where the laws are otherwise deficient or inadequate to furnish suitable remedies. *Brazier v. Cherry,* 293 F.2d 401 (5 Cir. 1961), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136.[7] Executive Order 11246, the successor to Executive Order 10925, does not create a private cause of action as a permissible method of enforcing the anti-discrimination provisions contained therein. *Farkas v. Texas Instruments, Inc.,* 375 F.2d 629, 632 (5 Cir. 1967); *Penn v. Schlesinger,* 490 F.2d 700, 702 (5 Cir. 1973), *rev'd on other grounds,* 497 F.2d 970 (5 Cir. 1974) (en banc). Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d [8] is also invoked by plaintiffs on the ground that the defendant hospital receives financial assistance from its patients obtaining benefits under the Medicare and Medicaid assistance programs of the United States. It is to be noted that neither the United States nor any recipient patient is here complaining, but only persons who, as former employees of the hospital, assert that they were subjected to racially discriminatory employment practices resulting in their termination. Thus, it very clearly appears that as to their Title VI claims, plaintiffs have no standing, which, as stated by the Supreme Court in *Data Processing Services v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), is determined by a two-step inquiry: first, "whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." 397 U.S. at 152, 90 S.Ct. at 829; secondly, "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question." 397 U.S. at 153, 90 S.Ct. at 830. Since the plaintiffs are not themselves the recipients of financial assistance or the beneficiaries of any program or activity receiving any applicable federal financial assistance, i. e., through Medicare and Medicaid, it follows that they are wholly without standing to assert claims under Title VI. *See Bob Jones University v. Johnson,* 396 F.Supp. 597 (D.S.C.1974), *aff'd* 529 F.2d 514 (4 Cir. 1975); *Player v. Alabama Dept. of Pen. & Sec.,* 400 F.Supp. 249, 259 (M.D.Ala. 1975), *aff'd* 536 F.2d 1385 (5 Cir. 1976). Indeed the Title VI cases which we have examined appear to have acknowledged standing only where the aggrieved parties were the intended beneficiaries of or participants in a federally assisted program. See, *e. g., Player, supra.*[9]

(a) § 1981 claims.

We first address whether plaintiffs, or any one of them, have established a

---

7. § 1988 was, of course, amended in 1976 to provide for an allowance of attorney fees to the prevailing party as part of the costs of certain civil rights actions, but this aspect of § 1988 would not in any case be here applicable since Title VII has a built-in provision for granting an attorney's fee to the prevailing party. 42 U.S.C. § 2000e–5(k).

8. No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of or be subject to discrimination under any program or activity receiving federal financial assistance.

9. There are other jurisdictional allegations which are so patently meritless that little need be said in consideration thereof.

The Fair Labor Standards Act, as codified in 29 U.S.C. § 206(d), prohibits discrimination by an employer on the basis of sex in disparate wage rates for female employees as opposed to those for employees of the opposite sex for equal work on jobs involving equal skill, responsibility and effort; plaintiffs have neither alleged nor offered proof of any such differential in wage payments by Calhoun County Hospital. Thus, any action based upon this statute cannot be entertained by this court in the context of the instant suit.

It is equally clear that 42 U.S.C. § 292 et seq., and § 296 et seq., of the Public Health Act of 1944 as amended do not confer upon the plaintiffs, on the basis of the pleadings and proof, any cause of action based upon alleged discrimination in employment on account of race or

case under 42 U.S.C. § 1981. It is now clearly established jurisprudence that for a plaintiff to prevail in a § 1981 action, he must show purposeful or intentional discrimination before casting upon a defendant the burden to rebut the charge. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). This principle was applied by the Fifth Circuit in *Williams v. DeKalb Co.*, 577 F.2d 248, *as modified at* 582 F.2d 2 (1978). The Fifth Circuit in *Williams* specifically held that a § 1981 claim is "to be equated with a claim under the Fourteenth Amendment [which the Supreme Court dealt with in *Washington v. Davis*], rather than under Title VII of the Equal Employment Opportunity Act." 582 F.2d at 2–3. In the case sub judice, the five plaintiffs, individually as well as collectively, have completely failed to show that the termination of their employment by the Calhoun County Hospital was motivated, in whole or in part, by purposeful racial discrimination. Suffice it to say that this dearth of proof in plaintiffs' case causes them to lose on their § 1981 claims. From the findings of fact, it is manifestly clear that each of the plaintiffs left her employment at the hospital on her own accord and her decision in this regard was in no way coerced or forced by any purposeful intent on the part of the defendant hospital officials to discriminate against them in the working conditions at the hospital on account of race.

(b) Title VII claims.

■■■ The court next considers plaintiffs' Title VII claims that disparate treatment because of their race led to their constructive discharge. It is axiomatic that, consistent with the reasoning articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff, in order to make out a prima facie case of discriminatory discharge, must show: (1) he is a member of a protected class; (2) he was discharged; (3) the discharge was not for a valid reason; and (4) the defendant continued to seek applicants for the vacant position. *Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864, 865 (6 Cir. 1975); *Peters v. Jefferson Chemical Co.*, 516 F.2d 447, 449–450 (5 Cir. 1975); *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251 (5 Cir. 1977); *Williams v. Yazoo Valley Minter City Oil Mill*, GC 76–77–S (N.D.Miss., 11–22–78) (unreported). Therefore, plaintiffs, to establish a prima facie case of discrimination, must show each of the foregoing elements. Once a prima facie case is established, the burden shifts to the employer to articulate and demonstrate that a legitimate, nondiscriminatory reason existed for the discharge. The plaintiff then has the burden of proving by a preponderance of the evidence that the employer's articulated reason was a pretext for discrimination. *Jones v. Texas Air National Guard*, 584 F.2d 104 (1978); *Turner v. Texas Instruments, Inc., supra; Williams v. Yazoo Valley Minter City Oil Mill, supra.*

■■■ A closely related principle is that in a Title VII case it is not an issue whether the employer has good cause to terminate an employee, or even if the employee is discharged unnecessarily or with-

---

sex. Similarly § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 is manifestly inapplicable since that section applies to the exclusion of handicapped individuals from participating in, or being denied the benefits of, or being subjected to discrimination because of their handicap under any federally assisted program or activity. Plaintiffs have neither alleged nor offered proof that they are handicapped individuals who would be otherwise qualified to participate in some form of federally assisted program.

Finally, with respect to claims allegedly arising under the thirteenth and fourteenth amendments to the United States Constitution, we are unable to perceive any cause of action applicable hereto, absent an allegation of a federal question under 28 U.S.C. § 1331, wholly apart from the causes of action granted by 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e. Nevertheless, the adverse disposition of these alternative grounds of asserted jurisdiction does not militate against the unquestioned right of plaintiffs to proceed with their causes of action founded upon § 1981 and Title VII.

out cause. The employer may not be held in violation of Title VII unless the plaintiff has proved that he was treated differently on account of his race from other employees with the same work history and committing the same type of infraction. *Turner v. Texas Instruments, Inc., supra,* at 1256–57. Finally, where the record in a Title VII action reflects the files and findings made by EEOC in the regular course of business, they are not only admissible but may be highly probative. *Peters v. Jefferson Chemical Co., supra,* at 450; *Smith v. Universal Services, Inc.,* 454 F.2d 154 (5 Cir. 1972). The facts heretofore found clearly establish that the four plaintiff maids left their employment on their own volition and were not the victims of a constructive discharge. To constitute a constructive discharge it must be shown that "the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation [so that] the employer has [accomplished] a constructive discharge and is as liable for any illegal conduct involved therein as if [the employer] had formally discharged the aggrieved employee." *Young v. Southwestern Savings & Loan Ass'n.,* 509 F.2d 140, 144 (5 Cir. 1975); *Calcote v. Texas Educational Foundation,* 578 F.2d 95 (5 Cir. 1978). *Calcote* made it plain that a constructive discharge is effectuated only if the "actions which caused [plaintiff's] working conditions to be intolerable were deliberate." 578 F.2d at 98.

Plaintiffs strenuously urge that they were the victims of constructive discharge in that the hospital officials, in the case of the maids, sought to impose upon them cleaning duties which would make intolerable their working conditions and hence they had no choice except to resign under coercion exerted by their employer. Similarly, in the case of the plaintiff Catherine Flora, the cook, it is contended that the denial of a three-week vacation with pay, to which she was concededly entitled, and subsequent harassment of her by her superior, Ms. Nettie Crocker, made her continued employment so unbearable as to force her resignation. We find these arguments advanced on behalf of the plaintiffs to be wholly devoid of merit. In the case of the four maids, the decision to use them to clean up the delivery room one night a week, whenever the occasion might arise, was not only reasonable but was a business necessity in view of the shortage in the nursing staff. The task involved no demeaning because of race, for the labor-delivery room during all other shifts was cleaned by nursing personnel of both races. The work of cleaning the delivery room itself was highly responsible, requiring adequate training before one could proficiently change from ordinary cleaning work customarily done by the maids to special cleaning required for the delivery room. Plaintiffs refused to accept the training and refused to make an intelligent inquiry or judgment as to how much time and how often they would be required to assume the task. In short, they utterly failed to make any effort to determine whether the added responsibility would be, in fact, as onerous as they now contend. The undisputed proof is that the two male porters, who remained on the job, did receive the training and adequately performed the cleaning of the delivery room; furthermore, other black maids hired in place of the departing plaintiff maids received such training and were able to discharge that duty on the 3 to 11 shift as well as to attend to their normal cleaning duties. The evidence fails to show any valid reason why the plaintiff maids should object to this reasonable request of their employer. Their peremptory refusal to undertake the task can be explained only in terms of their voluntary decision to work no longer at the hospital; and thus, they left of their own free will and accord. The evidence permits no other conclusion to be reached, and we hold that the plaintiff maids were not the victims of racial discrimination which led to the termination of their employment. We are wholly unimpressed with the assertion that certain working conditions, such as evidentiary indications of segregated bathrooms and dining room tables, had any causal relationship whatever with the plaintiffs' decision to leave their employment.

**1118**

We understand this to be the teaching of the Fifth Circuit in *Molina v. El Paso Independent School Dist.*, 583 F.2d 213 (1978), where the court, although dealing with a demotion case, enunciated the principle "where there is evidence of general discrimination, [a] defendant can still prevail [if] the evidence proves that the employee in question was demoted for nondiscriminatory reasons." 583 F.2d at 215. It is worthy of note that in *Molina*, evidence of racial discrimination had been adjudicated in prior litigation, but that holding did not carry over into a subsequent claim under Title VII that had no nexus with the prior adjudicated racial discrimination. *See also* B. Schlei and P. Grossman, Employment Discrimination Law 511 (1976):

> The basic principle is that an employer "has the right to discharge an employee for good reason, bad reason, or no reason absent discrimination." Thus, it must be understood in discharge cases that there can be a wrong without a remedy, and that an unfair discharge without a nexus to prohibited discrimination is not actionable under Title VII. (Footnotes omitted).

■ With respect to the separate claim of Catherine Flora, it is no less clear that the employer made a perfectly reasonable request that she delay—not surrender—her vacation because of the crisis created by illness of virtually the entire hospital dietary staff. The hospital did not question but that this plaintiff was entitled to a vacation of three weeks with pay because of her long tenure, and had the crisis situation not intervened she would have been granted her vacation on September 1, which was the time she desired to be off work. We reject as unreasonable the demand of an employee to go on vacation, irrespective of the circumstances confronting the employer's dire need for the employee in question to remain on duty for a reasonable length of time until a specific emergency necessitating his service has passed. Loyalty to an employer requires nothing less; any employee who fails to recognize this basic duty can hardly invoke the aid of a court of equity merely because a thought that her September 1 vacation was being withheld because of her color. Indeed, her vacation was delayed because of a hospital crisis, not on account of her race. Plaintiff Flora's inability to perceive this simple reality was the sole cause of her voluntarily quitting her job and not thereafter returning to work. While the court does not sit in judgment on the subjective beliefs of an employee which may influence his or her decision to quit work, mere personal impressions of an individual, without more, cannot form the basis for relief under Title VII.

■ We thus conclude that none of the plaintiffs have made out a prima facie case under Title VII. To the contrary, the overwhelming evidence is that they were not the victims of racial discrimination, in that they did not suffer constructive discharge, nor were they terminated from their employment for any reason attributable, in whole or in part, to racial discrimination.

(c) Defendants' claim for attorney fees and costs.

In their answer, by motion and in their legal memoranda, defendants have urged the court to award them, as the prevailing party in a Title VII action, attorney fees to be assessed against the individual plaintiffs as well as their attorneys. Defendants invoke the attorney fee provisions of Title VII, § 706(k) [10] as well as § 1006 as amended of the Legal Services Corporation Act which provides for an assessment against the Corporation of attorney fees and costs incurred by a defendant in defense of an action "commenced or pursued for the sole purpose of harassment of the defendant." [11] 42 U.S.C. § 2996e(f) (Supp.1977).

10. In any action or proceeding under this title [42 U.S.C. §§ 2000e et seq.] the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

11. If an action is commenced by the Corporation or by a recipient and a final order is en-

■ It should be noted that § 706(k) contemplates, in a proper case an award of attorney fees against the losing party, whereas § 2996e(f), the statute relating to the Legal Services Corporation which became effective December 28, 1977, imposes liability for attorney fees and costs directly against the Corporation for the acts or conduct of staff attorneys employed by the Corporation or any recipient agency thereof.

As regards § 706(k), the Supreme Court, in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), held that a federal district court might, in its discretion, award attorney fees to a defendant prevailing in a Title VII action only upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation, even without a finding of subjective bad faith. 434 U.S. at 421, 98 S.Ct. at 700, 54 L.Ed.2d at 656. Moreover, *Christiansburg* delineates a somewhat stricter standard for assessing attorney fees against a losing plaintiff in favor of a successful defendant than that which applies when a Title VII plaintiff prevails in his action. Id. 434 U.S. at 422, 98 S.Ct. at 700, 54 L.Ed.2d at 657. In the course of its opinion in *Christiansburg,* the Supreme Court admonished that the allowance of an attorney fee against unsuccessful Title VII plaintiffs should be done sparingly and should not be awarded merely because the Title VII plaintiff ultimately lost his case. Nevertheless, the Court pointed out

[t]hat the term "meritless" is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case, and that the term "vexatious" in no way implies that plaintiff's subjective bad faith is a necessary prerequisite to a fee award

against him. In sum, a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case *upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation, even though not brought in subjective bad faith.*" (Emphasis added). 434 U.S. at 422, 98 S.Ct. at 700, 54 L.Ed.2d at 656–657.

The Court later added:

[N]eedless to say, if a plaintiff is found to have brought or *continued* such a claim in *bad faith*, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense. (Emphasis added) Id. 424 U.S. at 422, 98 S.Ct. at 701, 54 L.Ed.2d at 657.

From our research no court has ever construed the parameters of the liability of the Legal Services Corporation for attorney fees and legal costs under 42 U.S.C. § 2996e(f), and the precise issue is one of first impression. On its face, the statute directs the court, "upon a finding that the action [brought by the Corporation or a recipient thereof] was commenced or pursued for the sole purpose of harassment of the defendant or that the Corporation or a recipient's plaintiff maliciously abused legal process to award reasonable costs and legal fees incurred by a defendant in such action." While this latter statute appears to be mandatory, given requisite findings by a court, and not discretionary as provided by Title VII's attorney's fee provision, both statutes expressly deal with governmental entities, EEOC in one instance and Legal Services Corporation in the other, to effectuate a valid waiver of governmental immunity for payment of costs and attorney fees in civil litigation. Unfortunately, the legislative history of § 2996e(f) is so sparse as to be practically nonexistent.[12] The per-

tered in favor of the defendant and against the Corporation or a recipient's plaintiff, the court shall, upon motion by defendant upon a finding by the court that the action was commenced or pursued for the sole purpose of harassment of the defendant or that the Corporation or a recipient's plaintiff maliciously abused legal process, enter an order (which shall be appealable before being made final) awarding reason-

able costs and legal fees incurred by the defendant in defense of the action, except when in contravention of a State law, a rule of court, or a statute of general applicability. Any such cost and fee shall be directly paid by the Corporation.

12. H.R.Conf.Rep.No.95–825, 95th Cong. 1st Sess. 18, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 4530, 4539, contains the only

# 1120

tinent Conference Committee Report was submitted on November 30, 1977. The final version of the bill, however, as passed by the House on December 7, 1977, and the Senate on December 15, 1977, included, without explanation, the mandatory version of the attorney's fee provision. The amendment in its present form became effective December 28, 1977. A principal purpose of this statute, in our view, was to effectually waive sovereign immunity for liability resulting from vexatious litigation commenced or pursued against a defendant by the Corporation,[13] or its authorized agents, since under the common law, courts of equity have traditionally imposed upon an adversary the payment of an attorney fee as part of the costs of an action brought vexatiously, in bad faith and solely for the purpose of harassment.[14]

■ Without the benefit of legislative guidance, courts must construe statutes in accordance with their clear and unambiguous meaning and abstain from engrafting exceptions by implication or which do not otherwise plainly appear in language used

by the Congress. We are of the view that although the Supreme Court decided *Christiansburg* on January 23, 1978, or nearly one month after the latest amendment to the Legal Services Corporation Act providing for mandatory attorney fees in certain cases, the Supreme Court's definition does shed light on how § 2996e(f) should be construed. The critical words in the latter statute, as applied to this case, relate to whether a finding can be made on the evidence that an action commenced by the Corporation, or one of its recipient branches, ["*was*] *pursued for the sole purpose of harassment of the defendant.*" North Mississippi Rural Legal Services is, of course, an authorized recipient agency wholly funded by the Corporation which, as the principal, would be liable for the acts of its authorized agents. Indeed, as the statute itself directly provides, "[a]ny such costs and fees shall be directly paid by the Corporation."

■ This brings us to a consideration of whether, under *Christiansburg's* doctrine, it is proper to assess attorney fees and costs

---

reference to the 1977 version of the attorney fees section of the Legal Services Corporation Act that our research has revealed:

LIABILITY OF THE UNITED STATES FOR LEGAL FEES AND COSTS

The Senate amendment adds a new section to the bill which permits the recovery of litigation costs, including attorneys' fees, by certain individuals or organizations when they prevail in civil litigation in which the United States is a party.

There is no comparable House provision.
The Senate recedes.

The conferees have taken note that similar proposals are being seriously evaluated by the Judiciary Committees in both Houses, as well as by the U. S. Department of Justice. The conferees have agreed that, while these inquiries may be desirable, further analysis and disposition should be left to the committees of jurisdiction. In view of this, and also because the provision is not germane under the Rules of the House, the conference substitute does not include the Senate provision. See also n. 16, *supra.*

13. Cf. *Alyeska Pipeline Serv. Co. v. Wilderness Soc.,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141, 156, n. 36 (1975). Note 36 appears to be the only reported case discussing this statute, which the Supreme Court there characterized as a "fee-shifting" statute.

14. *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). An analogous statute is the Debt Collection Practices Act of 1977, 15 U.S.C. § 1692k(a)(3) which provides:

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought *in bad faith and for the purpose of harassment,* the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs. (Emphasis added).

Pertinent legislative history of this section appears in S.Rep. No. 95–382, 95th Cong. 1st Sess, 5, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1695, 1700, which provides:

As in all other Federal consumer protection legislation, a consumer who obtains judgment on his behalf is entitled to attorney's fees and costs. In order to protect debt collectors from nuisance lawsuits, if the court finds that an action was brought by a consumer in bad faith and for harassment, the court may award the debt collector reasonable attorney's fees and costs.

against the unsuccessful Title VII plaintiffs and also against the Corporation under § 2996e(f). We are of the opinion that a meritless action which is prosecuted or pursued "in bad faith, vexatiously, wantonly, or for oppressive reasons," *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702, 707 (1973), is the legal equivalent of "an action pursued for the sole purpose of harassment of the defendant," within the meaning of 42 U.S.C. § 2996e(f). Indeed, the determination of whether an adequate factual basis here exists for assessing an award of attorney fees and costs against the plaintiffs under Title VII and against the Corporation under § 2996e(f) rests upon substantially the same rationale, whenever the element of bad faith can be found to exist. As the Supreme Court said in *Hall,* "the underlying rationale of 'fee shifting' [statutes such as § 2996e(f)] is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant." 412 U.S. at 5, 93 S.Ct. at 1946.

The present record is replete with evidence that from and after March 16, 1978, the date on which the court denied the maintainability of the suit as a class action and ordered that the five named plaintiffs prosecute their individual claims, plaintiffs and their counsel proceeded to ignore the court's ruling by embarking upon extensive discovery aimed largely at an endeavor to make out a class action in all aspects of the operation of the Calhoun County Hospital.[15] For example, on April 17, plaintiffs submitted their second set of 62 interrogatories directed, not at the issues involved in plaintiffs' individual claims but at all phases of the hospital's operation, and the history of its employment practices and procedures. At or about the same time, plaintiffs submitted 20 requests for admissions of fact, shortly supplemented by 61 more requests for admissions; all requests touched upon discovery matters having no relevance to the present action. Plaintiffs also proceeded to move for the production of ten categories of documents having little, if any, relationship to the present case. They took discovery depositions, comprising more than 250 pages, of the principal officials of the Calhoun County Hospital and which have scant relevance to the instant suit.

Despite EEOC's detailed findings of no reasonable ground to believe that the five individual plaintiffs had a basis for a discrimination suit, plaintiffs, through their counsel, obstinately carried on efforts at far-ranging discovery for which, when objected to by defendants, they moved to compel answers, but were unsuccessful in gaining approval of such discovery from the United States Magistrate. Moreover, plaintiffs improvidently appealed to this court from the magistrate's ruling, which appeal we peremptorily denied. In the course of abortive efforts to prepare for full evidentiary hearing before this court, plaintiffs, through their counsel, persistently at every turn moved for reconsideration by the court of its ruling that the action not be certified as a class action (see n. 1).

At the full trial on the merits, plaintiffs' counsel sought to introduce voluminous evidence having no relationship whatever to the worth of plaintiffs' individual claims. When much of this evidence was stricken by the court, plaintiffs tendered an offer of proof on issues which, in our judgment, were entirely foreign to the case. The hearing itself, which consumed five days and was characterized by persistent heated exchanges between counsel for both sides, could surely have been completed within a day and a half had plaintiffs restricted the evidence to issues going to the merits vel non of plaintiffs' individual claims of constructive discharge. The conduct of this litigation by plaintiffs, which, if its meritlessness was not apparent at the outset,

---

**15.** Two proper courses are open to plaintiffs dissatisfied with a trial court's refusal to certify. One is to seek immediately an interlocutory appeal under 28 U.S.C. § 1292(b), the other to assign the ruling as error on appeal upon entry of final judgment. Here, however, plaintiffs sought no interlocutory appeal. *See Johnson v. Georgia Highway Exp., Inc.,* 417 F.2d 1122 (5 Cir. 1969).

became readily evident after the case failed to receive class certification, was without doubt for months carried on in a vexatious, wanton and oppressive manner.

The Corporation's counsel, by their obstinate refusal to recognize the orders of this court denying class certification and by engaging in discovery and trial procedures which ignored this court's consistent orders that the case was not maintainable as a class action, can be only viewed as pursuing the litigation in bad faith. Especially is this true when, as we judicially note from the records and files of our court, the same attorneys representing these five plaintiffs, after losing the class action issue, instituted, on June 20, 1978, another action against the same hospital,[16] *Corbitt v. Moore,* WC 78–62–K, charging across-the-board employee discrimination on account of race and sex in all aspects of the hospital's administration, and seeking to represent a class composed of all persons similarly situated with the named plaintiff at all levels of the hospital staff. The jurisdictional allegations in that companion suit are legion and identical to those raised herein. There can be no question that litigation conducted in such manner is not merely contumacious of solemn judicial orders, see *Flora v. Moore,* 78 F.R.D. 358, 361 (N.D.Miss.1978) (denying class action), but must be viewed as pursued for the sole purpose of harassing the defendants. This conclusion is reinforced when a review of the plaintiffs' evidence offered at trial reveals that it was geared principally to efforts to establish a general pattern of racial discrimination at Calhoun County Hospital rather than whether rights of five plaintiffs were violated by their being subjected to constructive discharge because of race.

We therefore hold that a reasonable attorney fee and costs of the action should be assessed against Legal Services Corporation. As a court of equity, we are aware that the individual plaintiffs, themselves indigent persons, left the entire control of the litigation to staff attorneys employed by the Corporation, and they were personally unaware of the irresponsible and vexatious manner in which their counsel were pursuing their action against the defendants. Although § 706(k) might be read to make plaintiffs legally liable, it would, we think, be unjust to impose personal liability upon the plaintiffs on a theory of vicarious responsibility under such circumstances. Moreover, it is manifestly clear that Congress has mandated that the payment of attorney fees and legal costs in an action of this character shall be imposed directly upon the Corporation. This remedy will effectually reimburse the prevailing defendants for their legal expenses. Such assessments against the Corporation, while they are punitive, may be of beneficial effect in the administration of justice in that the payment of the adversary's legal expenses is calculated to make the Corporation aware of its affirmative duty to properly and responsibly conduct litigation which it commences or prosecutes in the courts of this Nation. Finally, the statute imposing liability upon the Corporation contains an added measure of protection in that any order imposing attorney fees and costs against it shall be appealable before being made final. As far as this court is concerned, however, a contrary conclusion on the present record would render meaningless the clear and unambiguous Congressional mandate of 42 U.S.C. § 2996e(f).

16. These tactics are reminiscent of the ancient biblical struggle between David and Goliath. Arrayed on the one hand is the small, financially troubled hospital in Pittsboro, Mississippi; on the other is a mammoth federally-subsidized agency whose appropriation for the current fiscal year is no less than $200,000,000. The attorney's fee provision of § 2996e(f) was designed to provide a deterrent to precisely this kind of abuse. Even the original proposal for an attorney's fee provision, which contained no such restrictive language as "for the sole pur- pose of harassment" or "abuse of legal process" and permitted fee awards in the discretion of the court, was introduced for the express purpose of protection against frivolous suits by the Corporation and to provide a "restraining effect" upon the prosecution of such actions. 119 Cong.Rec. 20723 (1973) (remarks of Rep. Green). *See,* H.R.Con.Rep.No.93–1039, 93d Cong., 2d Sess. (1974) (Joint Explanatory Statement of the Committee of Conference accompanying H.R.No.7824, May 13, 1974).

In order that the defendants may have a guide for submitting to the court their claim for attorney fees, in addition to reimbursable out-of-pocket expenses, relative to this litigation, we direct that they follow the guidelines outlined by us in *Neely v. City of Grenada,* 77 F.R.D. 484 (N.D.Miss. 1978), wherein we enumerated the criteria set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (1974), as applied to awarding fees in Title VII cases. In addition to the twelve factors therein detailed as pertinent for consideration, defendants shall compute the reasonable costs of legal services and other litigation expense from and after March 16, 1978, to this date for a single attorney. Counsel should bear in mind, in submitting their affidavits, the amount of time expended in court and for immediate trial preparation, for which the court proposes to allow $40 an hour for time of a single attorney; and time expended in research, discovery, pleadings, conferences, and travel calculated at the rate of $30 per hour. These explicit instructions are for the guidance of defense counsel who shall, within 15 days from this date, file with the clerk of this court their affidavits enumerating the elements of service, time and charges consistent herewith. Counsel for plaintiffs shall have ten days from the filing of such affidavits to controvert the same by counteraffidavits. The court shall, without further evidentiary hearing, then make final computation of the attorney fees and litigation costs, and enter said amount as part of final judgment to be entered herein.

Let an order issue accordingly.