**Verdia JONES, Plaintiff,**

v.

**Robert BIRDSONG, Leon Porter, Jr., Glenn D. Gates, Mayo Wilson, Jessie G. Hughes, Jr., Individually and in their official capacities as Members of the Board of Trustees of the Clarkdale Municipal Separate School District, Robert M. Ellard, Individually and in his official capacity, Superintendent of Education of the Clarksdale Municipal Separate School District, Terry Mood, Principal Clarksdale High School, Defendants.**

**No. DC 77–94–K.**

United States District Court,
N. D. Mississippi,
Delta Division.

June 2, 1980.

Charles Victor McTeer, Greenville, Miss., for plaintiff.

Semmes Luckett, Clarksdale, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

On September 23, 1977, plaintiff Verdia Jones, a black former employee of the Clarksdale Municipal Separate School District, instituted this employment discrimination suit against the defendants, Robert Birdsong, Leon Porter, Jr., Glenn D. Gates, Mayo Wilson, Jessie G. Hughes, Jr., mem-

bers of the school board in their official capacities and individually, Robert M. Ellard, superintendent of education, in his official capacity and individually, and Terry Mood, principal of the Clarksdale High School, seeking reinstatement, back pay, compensatory and punitive damages, attorney fees and costs. The complaint as amended alleged federal jurisdiction under 28 U.S.C. §§ 1331, 1343(3) and (4) for causes of action arising under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq., the Civil Rights Statutes, 42 U.S.C. §§ 1981 and 1983, the Equal Protection Clause of the fourteenth amendment, and the desegregation order of this court entered January 10, 1970, in *Henry v. Clarksdale Municipal Separate School District*, No. DC 64–28–K, which incorporated the faculty and staff provisions mandated by *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5 Cir. 1969). By joint answer, defendants denied the charges of racial discrimination, and asserted that the plaintiff was employed as a faculty member until the end of the school year 1976–77, that she was offered a contract for the ensuing year 1977–78, but that she voluntarily rejected the tendered reemployment and thereafter ceased to be in defendants' employ.

In her amended complaint, plaintiff stated her grievances at length in eight counts. Count I charged that plaintiff began her employment with the defendant board as a teacher-counselor in 1962, a year later she became a full-time guidance counselor at the all-black Higgins High School, and that she held this position until February 1970. At that time, pursuant to the court order mandating the merger of the formerly separate white and black junior-senior high schools, she was reassigned as a guidance counselor to Clarksdale High School, but demoted in the reassignment since she was given less job responsibility and assignments requiring a lesser degree of skill than she had previously exercised at the Higgins position and which her white counterpart, James Grimmett, continued to exercise as guidance counselor at Clarksdale High School.

Count II alleged that in 1974 Grimmett, white guidance counselor, was promoted to the assistant principalship of Clarksdale High School and the school board hired Robert Eavenson, also white, to fill his position, and that after Eavenson's employment, defendants continued the ongoing demotion of plaintiff because of race by assigning her subordinate jobs and inferior professional job responsibilities as compared to those held by Eavenson.

Count III charged that plaintiff was further demoted and discriminated against because of her race in the school year 1976–77 by being given a contract of employment conditioned upon availability of Title I funds, a provision which denied her substantial job security, and that she was required to perform duties as a Migrant Career Awareness counselor, a position involving less responsibility and less skill than the post which she had held at Clarksdale High School.

Count IV averred that during the next school year, 1977–78, she was further demoted and discriminated against on the basis of race by being offered a contract of employment conditioned upon availability of Title I funds and which would have required her to perform duties involving less responsibility and requiring less skill than her former position as guidance counselor at Clarksdale High School, and, accordingly, she rejected this contract.

Counts V and VI asserted that defendants maintained a policy and practice of offering white employees job assignments, promotions and positions paying additional money without making such offers to black employees, including the plaintiff, who requested such job promotions and positions, but was denied same because of her race.

Count VII charged that prior to her rejection of the 1977–78 employment contract which contained objectionable terms, defendants offered and she accepted another employment agreement not conditioned upon the availability of Title I federal funds, but that the defendants have failed and refused to honor that contract, as a

consequence of which plaintiff suffered damages for salary loss of $13,083 for the 1977–78 school year.

Count VIII charged that as a result of defendants' racially discriminatory employment practices plaintiff has suffered and will continue to suffer damages resulting from her nervousness and mental anguish attendant upon her loss of professional status as a guidance counselor.

After extensive discovery, the parties appeared before a United States Magistrate for pretrial conference held March 16, 1979. However, a pretrial order containing lengthy statements of claims and defenses, together with certain factual stipulations, was not submitted to the court until July 19. Trial scheduling was delayed because of illness of counsel. On February 19, 1980, the court conducted a 4-day evidentiary hearing. Illness of counsel again delayed prompt submission of post-trial briefs, which the court has now considered and finds the case ripe for disposition. Incorporated herein are findings of fact and conclusions of law required by Rule 52(a), F.R. Civ.P.

## I. FINDINGS OF FACT

*Background.*

On January 10, 1970, this court entered an order in the Clarksdale school desegregation case, *Henry v. Clarksdale Municipal Separate School District*, No. DC 64–28–K, mandating the establishment by February 1, 1970, of a single high school to be known as Clarksdale High School and housed in the Bobo and Dorr buildings previously occupied by the all-white Clarksdale Junior-Senior High School. The Clarksdale Junior High School was housed in the Higgins High School complex, formerly used as the all-black junior-senior high school. *Singleton*'s standard provisions for employment of faculty and staff during the desegregation process were incorporated in the court's order.

Plaintiff, now 49 years old, holds a Bachelor's degree from Xavier University (1951), a Master's degree in guidance from Indiana University (1957), and an educational specialist degree in guidance and psychometry from Delta State University (1977). She is licensed as guidance counselor, classroom teacher and psychometrist.

Plaintiff was first employed by the defendant board as a teacher-counselor in 1962; a year later she became a full-time guidance counselor at the all-black Higgins High School and continued in that position until February 1970. Upon entry of the desegregation order, plaintiff was reassigned as a guidance counselor in Clarksdale High School. From February 1970 forward, plaintiff was continued as a guidance counselor at Clarksdale High School with James Grimmett, white, who had been employed as a guidance counselor in Clarksdale High School prior to the desegregation order. Plaintiff and Joseph Hardy, black, the former principal of Higgins High School who was reassigned as assistant principal of Clarksdale High School, had adjoining offices in the same suite in the Dorr Building together with Helen Green, a white secretary. James Grimmett had his office in the Bobo Building in a suite occupied also by Robert Ellard, then principal of Clarksdale High School, with a white secretary. The Dorr and Bobo buildings were located on the same campus and connected by a covered arcade or walkway. The records of black students were kept in the Dorr suite until Helen Green was transferred to the principal's office in the Bobo Building in 1972. Thereafter, all student records were kept in a vault located in the principal's office. Plaintiff had difficulty getting access to student records after this transfer.

Plaintiff continued to be employed as a high school guidance counselor for 12-month periods for the next four years. She received the same annual salary as Grimmett, who was also annually reemployed. In addition to regular salary, Grimmett, however, received certain compensation for coaching tennis and basketball. For the next ensuing two years, plaintiff was employed as occupational orientation teacher and counselor at Clarksdale High School for an 11-month period. She taught three peri-

ods of occupational orientation daily and served as counselor for two periods. During these years Eavenson, Grimmett's replacement as a counselor, was hired at a lesser salary than plaintiff received. However, Eavenson had no teaching duties and devoted his entire time to counseling.

For the school year 1976–77, plaintiff was employed as a career awareness counselor in the Migrant Program for 10 months at a greater salary than Eavenson received as a guidance counselor at Clarksdale High School. This employment transferred plaintiff out of Clarksdale High School to work as counselor with 6th, 7th and 8th grade students. In the spring of 1977 plaintiff was offered a contract of reemployment as career awareness counselor for 10 months for the school year 1977–78 which she refused to accept because the contract contained a stipulation in ¶ 6 reading as follows: "In the event that funds are not furnished to this school district, or cease to be furnished under Title I of Congressional Public Law 89–10, 92–318, 93–380, this contract shall terminate." All other contracts made by the school board for services performed under Title I programs had similar clauses. Approximately 75 employees, almost equally divided between blacks and whites, were employed under such contracts. When plaintiff objected to this provision, Superintendent Ellard sought without success to have the school board waive its inclusion in the agreement. Plaintiff was unwilling to sign a new contract. In September 1977, Superintendent Ellard requested plaintiff to reconsider her decision not to accept a renewal contract for 1977–78 containing the required ¶ 6, but she rejected such request. Since plaintiff left the defendants' employ, no one else has been hired as a guidance counselor at the Clarksdale High School.

*Guidance Counselor at Clarksdale High School.*

Plaintiff was employed in this capacity from the date of the court-ordered reassign-

ment until June 30, 1976, a period of six and one-half years. She served under three high school principals, Robert Ellard (1970–72), Sam Kendricks (1972–74), and Terry Mood (1974–76). Prior to the court order, Clarksdale Junior-Senior High School had two counselors and Higgins Junior-Senior High School also had two counselors. After the consolidation of the three-grade high school, student enrollment increased to 865; of that number 480 were white students previously attending Clarksdale High School, while 385 were blacks who were transferred from Higgins. Two counselors, Grimmett and plaintiff, were assigned to the high school and two counselors were assigned to the junior high school. There was no reduction in the number of counselors employed in the high school, nor did any discharges occur in the faculty of any school because of the resignation of 28 teachers of both races.[1] The greatly increased high school student population rendered it necessary to utilize not only the Bobo building which had previously served as the all-white high school but also the Dorr building, formerly occupied by the white junior high school students and staff. Grimmett continued to have his office in Bobo, adjoining the principal's outer office, where records of white students were kept in a vault. Grimmett knew the vault combination but plaintiff did not. Plaintiff, placed in the Dorr building, had easy access to the records of the transferred black students until such records were moved to the Bobo vault several years later. Having readily available student records was important to the counselor since a principal function was to direct students in career preparation based on course work. After the records transfer plaintiff was disadvantaged in serving students who sought her counseling. Their records had to be sent to her Dorr office, upon plaintiff's request. She was further handicapped when the assistant principal and his secretary moved to the first floor suite in the Dorr building when it was vacated by the superintendent and his staff,

---

1. These statistics are taken from the opinion in *Hardy v. Porter*, 443 F.Supp. 1164 (N.D.Miss. 1977), *aff'd* 613 F.2d 112 (5 Cir. 1980).

which left plaintiff alone in an upstairs office, without ready secretarial service. Yet plaintiff did not ask to move her office to Bobo, which was only a two minute walk distant from Dorr. Though the selection of a counselor was a student's choice, teachers often referred students to a particular counselor, and several students thought Grimmett was the only counselor at the high school. Plaintiff felt that Grimmett's more prominent location, which displayed a counselor sign, was an unfair preference. This arrangement of separate offices for two counselors was criticized by a team of educational experts who recommended combining them to prevent duplicative services and provide equal secretarial service, and removing both counselors from the principal's office, which was more often associated with student discipline than career development. This recommendation was never carried out, for Ellard thought it was a wise practice to have the high school principal and a counselor in Bobo and the assistant principal and a counselor at Dorr. He defended the arrangement as providing greater availability of counseling to students as well as more privacy.

Because of lack of specific policies, the two counselors operated somewhat independently of each other, with each pursuing his or her primary interest. The evidence is sharply in dispute as to what extent plaintiff performed the normal duties as a guidance counselor. Notwithstanding plaintiff's feeling that she was being slighted, she regularly had teachers' master schedules; she was introduced to the students as a counselor at orientation seminars; she assisted in the tasks of registering, scheduling and testing many students. Plaintiff had available as many college manuals as Grimmett. She participated as a counselor in college day and career day programs. The court is convinced that the physical layout of her office accounted for many of the irritating problems which plaintiff encountered during this period. For example, the counselor's mail box was located near Grimmett's office, and this often caused delay to plaintiff in receiving mail. College recruiters frequently appeared at the principal's office to interview students with little, if any, notice to plaintiff. Students' correspondence courses during summer sessions were largely handled by Grimmett, although plaintiff was not precluded from performing this voluntary assignment. Intercom messages emanating from the principal's office, and often prepared by Grimmett, tended to feature his name unless plaintiff prepared separate messages to the students. During summer sessions, one entrance to the Dorr building would often be closed, making it more difficult to reach plaintiff's office. Finally, plaintiff felt that she had poor communications with the high school principals, yet she was highly rated as a capable counselor by all high school administrators; and each year she was recommended by her principal for reemployment. The two counselors received virtually the same compensation.

The court finds as a fact that plaintiff during her employment at Clarksdale High School as guidance counselor had the usual and ordinary responsibilities of the position and performed tasks requiring the skills of a professionally trained counselor. True enough, she did not perform all duties for all high school students as she had as a Higgins' counselor, but that was hardly possible with a greatly enlarged student body where cooperative assistance between the two counselors became a necessity. The court also finds as a fact that separate offices for two counselors was the cause of friction and certain administrative problems naturally expected from such an arrangement, but this as well as lack of better direction from the high school principals to coordinate the work between the two counselors was the result of poor and inadequate school planning, not of racial motivation. From our evaluation of plaintiff's lengthy testimony, it is evident that she allowed numerous small things apt to occur in any school operation to become magnified as working against her.

At the end of the school year 1974, Superintendent Ellard decided that it would be beneficial to institute occupational orientation classes at Clarksdale High School and

the course could be best taught by a guidance counselor. By this arrangement, state funds could be obtained to pay a portion of a counselor's salary, which was otherwise payable from local school funds. Terry Mood, then principal, recommended that plaintiff teach the course. Plaintiff was scheduled to teach three class periods. The course was first a required subject for all students taking home economics and shop, later it became elective. Ellard regarded this assignment as a good opportunity for the counselor to have direct contact with many students having vocational interest, but plaintiff regarded teaching duties as a demotion. Plaintiff believed that teaching three class periods daily deprived her of 60% of her time for individual student counseling and also that under the 1974–75 contract her work would be reduced to an 11-month period instead of a full year, with some loss of pay. She objected to change in the duty date, claiming it deprived her of an earned vacation under the previous year's contract. Accordingly, plaintiff protested the 1974–75 contract to Ellard and requested a conference with the school board to present her grievances. She thought she was being discriminated against by being selected to teach occupational orientation since Robert Eavenson, the newly hired white counselor who moved into Grimmett's office, was free to devote his entire time to counseling. When Ellard refused to arrange a board meeting for plaintiff, she engaged attorneys at Jackson, Mississippi, to represent her interests. No adjustments were made as a result of her complaints. Needing work, plaintiff accepted teaching duties and continued to serve as counselor. Her teaching and counseling assignments were performed for the following year, 1975–76, under an identical contract which was renewed without incident. Plaintiff, however, continued to express her feelings to school officials that she had been reduced to a "three-fifth teacher" status, with only limited counseling responsibilities. She was still maintained in an inconveniently located office without direct access to records and secretarial service. Plaintiff consistently considered her job in

teaching occupational orientation as a further demotion in employment which she attributed to her sex and race. From the evidence, some students came to regard plaintiff as a classroom teacher and did not realize that she was also a guidance counselor. Plaintiff was qualified to teach occupational orientation, having received such training previously at the school board's expense. Eavenson was likewise qualified to teach the course. Because of her experience and training, plaintiff's credentials as a counselor were superior to Eavenson's. Eavenson, in fact, looked to plaintiff for advice and leadership. Principal Mood, on several occasions, urged that plaintiff and Eavenson cooperate on joint counseling programs. As a consequence, plaintiff had greater rapport and understanding with Eavenson than she had previously enjoyed with Grimmett. With respect to the 11-month employment, all counselors beginning August 1, 1974, were hired for like periods, and plaintiff was not singled out for different treatment in this regard. The court finds as a fact that teaching occupational orientation to students interested in career opportunities was of equal importance to individual counseling, and that such an assignment did not reduce the responsibility of the guidance counselor.

*Career Awareness Counselor for School District.*

In the spring of 1976 Ellard discussed with plaintiff the possibility of leaving her job at Clarksdale High School to be employed by the school district as a career awareness counselor with offices in the Myrtle Hall building, which housed an elementary school. This new program would bring the career awareness counselor into contact with students in the 6th, 7th and 8th grades throughout the city, and the counselor would be required to visit various schools in the course of counseling activities. Although this opportunity appealed to plaintiff, she did not immediately understand that the job was to be federally funded by Title I, nor that she would work under the direction of William Metcalf, the Title I federal fund coordinator. Upon the

signing of her 1976–77 employment contract, no reference was made to the fact that she would be paid from Title I funds. According to Ellard, that provision was inadvertently omitted from the written agreement. Plaintiff entered upon her new job, and soon learned that she would be working under Metcalf and would receive compensation under the Title I program and not district school funds. The career awareness program was a pilot program which dealt with migrant students. Metcalf found her work very acceptable, but plaintiff did not find it to be as satisfying as her previous position at Clarksdale High School. In the spring of 1977 Ellard tendered plaintiff a new contract of employment as career awareness counselor for the next year, 1977–78. The first document did not contain the correct salary (13,083) and she returned it unsigned to the superintendent. A second document containing the correct salary but without a clause stating that her employment was conditioned upon the availability of Title I funds was sent to plaintiff. She signed this contract and returned to the superintendent for completion. Soon thereafter she received another contract document containing the Title I clause. Plaintiff objected to that provision. Ellard tried to get the school board to remove the offensive paragraph from the contract, but the board refused on the ground that all Title I employees were employed under such understanding. Plaintiff persisted in rejecting the tendered contract, and she was not rehired by the board. Indeed, the Migrant Program which Ellard had envisioned for next school year was cancelled in August 1977. Even so, Ellard notified plaintiff that he wanted to retain her in the school system and offered her continued employment as an elementary guidance counselor, a position which was also federally funded under Title I. Plaintiff and her attorney conferred with Ellard about the offer, and she declined employment so long as it was a Title I job and insisted that she be rehired as a guidance counselor paid from general school funds.

*Other Job Opportunities.*

Plaintiff complained that she was not offered the jobs of drug consultant and psychometrist although these positions were filled by others while plaintiff was still an employee of the Clarksdale schools. However, plaintiff did not apply for either position, or make known to the school officials that she was interested in employment other than as counselor.

In the summer of 1977, the board opened a new vocational-technical center (vo-tech) under the direction of Carl Keen. This brought about the need for a technical vocational guidance counselor to work as part of Keen's staff. Plaintiff made inquiry of Ellard about obtaining the position. According to plaintiff, Ellard made no response, but Ellard denied that and testified that he suggested she contact Keen. The court finds as a fact that plaintiff was directed to apply to Keen and that she failed to do so. Keen first recommended an applicant from Alabama, who eventually declined the job, and Keen made no attempt to fill the position after school opened in the fall of 1977. In March 1978, after plaintiff was no longer a school employee, Ellard advertised the vacancy through the school system. Keen received applications from Varner Rencher, a black guidance counselor, Dorman Howell and Roger Pitt, white counselors. With her qualifications, plaintiff could have secured a temporary permit to act as vocational technical guidance counselor, but she never applied to Keen, and hence was not interviewed for the job. Keen recommended Pitt for the new position, and he was hired by the board at an annual salary of approximately $13,000. Keen preferred Pitt because of his background in adult education since the vo-tech center was offering 14 classes in adult education. In addition, Pitt was working on his PhD degree at Mississippi State University and came recommended by Dr. Norman of the State Department of Vocational Education.

After leaving the employment of the Clarksdale public schools, plaintiff in October 1977 was employed as vocational coun-

selor and later as manpower director of Coahoma Opportunities, Inc., at a salary of $13,000 annually, payable $500 biweekly. She remained in the employ of this agency until November 1979, when she was terminated for insubordination.

Plaintiff testified at trial that she had suffered great emotional distress from her feelings of rejection and discrimination in her employment at the Clarksdale schools, and that she experienced episodes of depression, insomnia and anxiety. Upon her attorney's recommendation, she consulted Dr. Gilbert McVaugh, a psychologist, in the fall months of 1978 for examinations and received therapy treatment from him in July 1979. The psychologist was of the view that plaintiff was suffering from an emotional condition akin to combat fatigue and that she was overwhelmed by a feeling of helplessness. He attributed this condition to plaintiff's beliefs that her rights had been denied and that her frustrations would subside only upon her realization that she was treated fairly.

## II. CONCLUSIONS OF LAW

*Singleton Claim.*

In *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5 Cir. 1969) (en banc), *rev'd in part on other grnds sub nom. Carter v. West Feliciana Parish School Board*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), the Fifth Circuit Court of Appeals responded to the Supreme Court's mandate in *Alexander v. Holmes County Board of Education*, 369 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), that school districts immediately begin to operate unitary schools and established certain guidelines for school desegregation. Realizing that the desegregation of school districts could result in the loss of job positions due to the consolidation of dual schools and/or the loss of student enrollment, the court adopted standards to insure that any reduc-

tion in personnel did not operate to exclude or otherwise discriminate against blacks in the establishment of the unitary system, as follows:

If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition, if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

Prior to such a reduction, the school board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

*Singleton, supra*, at 1218.

Plaintiff claims her *Singleton* rights were violated since the school officials demoted her by requiring her to teach occupational orientation, then by directing that she serve as a career awareness counselor, and lastly by asking her to be an elementary school counselor.[2]

■■ The burden is on the plaintiff to show that the strict standards enunciated in

---

2. She also maintains she was demoted by being required to serve as assistant to the white counselor and was not allowed to perform many of her duties at Higgins. We have found as a fact, however, that plaintiff's duties were comparable to the white counselor's and that any difference in job tasks was necessitated by a larger student body, requiring the division of counselor duties and by physical factors such as office location in the Dorr building.

*Singleton* are applicable to her claims. *Lee v. Pickens County School System,* 563 F.2d 143, 145 (5 Cir. 1977). To be entitled to invoke *Singleton's* requirements, plaintiff must prove "a reduction in personnel because of desegregation, . . . resulting in demotion." *Id.* at 145–46 (footnotes omitted). Even assuming that the school system was still in the process of desegregation during the times when plaintiff was assigned teaching and other tasks,[3] we hold that plaintiff has failed to establish either a reduction in force or resulting demotion.

*Singleton* applies only when school personnel are displaced as a result of desegregation. *E.g., Lee v. Chambers County Board of Education,* 533 F.2d 132, 135 (5 Cir. 1976). We have found as a fact that no reduction in the number of counseling positions occurred after desegregation and that no staff member was discharged.[4]

Moreover, plaintiff failed to prove she was demoted as defined by *Singleton* as follows:

"Demotion" as used above includes any re-assignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period.

*Singleton, supra,* at 1218. As the Fifth Circuit has stated, "[t]he real gist of demotion is a reduction in responsibility." *Lee v. Macon County Board of Education* (Muscle Shoals), 453 F.2d 1104, 1109 (5 Cir. 1971). Since plaintiff's reassignment did not result in the payment of lower wages and since she was certified to teach vocational guidance classes, plaintiff must prove that her duties were less responsible, required less skill, or constituted a position for which she was not substantially experienced in order to recover under *Singleton.* This she failed to do.

As to the occupational orientation class which plaintiff was required to teach from 1974 to 1976, we have found as a fact that this assignment was of equal importance to individual counseling and did not reduce her responsibility or prestige as a counselor. She had received specific training to do such teaching. We similarly find that the job did not require less skill and that plaintiff was substantially experienced to teach the course, since it in effect differed from her past counseling experience only inasmuch as she was counseling groups of students as opposed to individuals. School administrators are entitled to exercise responsible professional judgment in the assignment of personnel to conduct the changing course work offered in their schools, without interference from the federal courts.

The career awareness counselor's position was likewise essentially equivalent to plaintiff's past work as a counselor. It was certainly a reasonable assignment for the superintendent to make. It appears that this position enhanced plaintiff's responsibilities since it was a pilot program which required her to visit various schools and come in contact with many students. Although this position was funded through Title I funds, plaintiff suffered no financial detriment, and we cannot fairly conclude that this factor alone is sufficient to constitute a *Singleton* demotion. Indeed, what may be the source of funds—whether federal, state or local—used to pay school personnel can be of no valid concern to anyone who receives full compensation for his employment.

We also find that the district's offering plaintiff an elementary counseling position

---

3. *See Lemon v. Bossier Parish School Board,* 444 F.2d 1400, 1401 (5 Cir. 1971).

4. Plaintiff's argument that she was reduced from a full-time counselor to a two-fifth counselor fails for the same reason that her claimed "demotion" argument discussed *infra* fails, i.e., her three-fifths teaching duties constituted counseling services to students in a classroom setting.

was not a demotion. We are supported by *Lee v. Russell County Board of Education*, 563 F.2d 1159, 1162 (5 Cir. 1977), wherein the Fifth Circuit expressly held that a reassignment from high school to elementary counseling did not constitute a demotion.

Finally, plaintiff's case largely rested on her own testimony to establish a *Singleton* demotion. The several assignments given or offered to plaintiff were in the field for which she was trained and had requisite experience, yet she found each progressively more distasteful. "Subjective impressions as to the desirability of one position over another cannot control our decision of whether there has been a decline in responsibility." *Id. See Flora v. Moore*, 461 F.Supp. 1104, 1118 (N.D.Miss.1978).

*Title VII Claims.*

Section 2000e–5 of 42 U.S.C. provides that a charge of discrimination must be filed within 180 days of the alleged unlawful employment practice. The Supreme Court has held that failure to file a charge within this time period renders the alleged discriminatory act "an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571, 578 (1977).

Plaintiff filed her charge of discrimination on September 14, 1977. Ordinarily, therefore, we would have jurisdiction only over those violations which occurred subsequent to March 18, 1977. *See McArthur v. Southern Airways, Inc.*, 569 F.2d 276 (5 Cir. 1978) (en banc).

■ Plaintiff argues that we may consider all the incidents subsequent to her reassignment at Clarksdale High School in 1970 under the continuing violation theory. *Evans*, however, made clear that "the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists." *Evans, supra.* The Fifth Circuit has explained this language as follows:

> Where an employee charges an employer with continuously maintaining an illegal employment practice, he may file a

valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice. . . . However, where the employer engaged in a discrete act of discrimination more than 180 days prior to the filing of a charge with the EEOC by the employee, allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refused to rectify its past violation will not satisfy the requirement of 42 U.S.C. § 2000e–5(e) that the plaintiff file his charge of discrimination within 180 days of the discriminatory act.

*Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 249 (5 Cir. 1980) (citations omitted). We are required, therefore, to consider only those alleged violations which occurred after March 18, 1977. If any of those violations were also present prior to that time, we may then consider the past violation also.

During spring 1977 plaintiff was acting as career awareness counselor and was tendered a contract for the same position for the school year 1977–78. She signed a contract document which was not conditioned on the availability of Title I funds, but this contract was not approved by the school board. Subsequently, plaintiff refused to sign another agreement identical to the one she signed except for the inclusion of a Title I clause. Plaintiff was also offered a position as elementary counselor, also funded under Title I. She refused this job, again on the ground that she would be paid for her services with Title I funds. In the summer of 1977, plaintiff inquired about the position of technical vocational guidance counselor although, as we have found, she failed to apply to the proper individual as instructed.

■ Accordingly, we may consider only plaintiff's claims of disparate treatment in regard to her position as career awareness counselor, the board's offer to employ her as elementary counselor, the Title I provision, the failure to hire her as vo-tech counselor, and her claim of constructive dis-

charge surrounding the 1977–78 contract negotiations.[5]

*Disparate Treatment Claims.*

Plaintiff claims she was treated differently than white counselors by being required to be a career awareness counselor and by being requested to act as elementary counselor, with her continued employment conditioned on the availability of Title I funds. Plaintiff also claims discrimination by failing to offer her the position of vo-tech counselor and hiring instead an allegedly less qualified white. These claims are of "disparate treatment," which is to be distinguished from claims of disparate impact of facially neutral employment practices. As the Supreme Court has held:

> "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical although in some situations it can be inferred from the mere facts of differences in treatment.

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396, 415 n.15 (1977).

Employers are neither expected nor required to treat each employee exactly the same; hence, the "central focus" is whether the alleged discriminatee has been treated "less favorably" "because of race." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978).

Since we have previously determined that the positions of career awareness counselor and elementary counselor are substantially equivalent to a high school counselor's position, we must therefore conclude that she was not treated less favorably than white counselors. As to her contention that her job was less secure than that of white counselors because of the Title I paragraph, plaintiff failed to establish even an inference of discriminatory motive by the inclusion of the paragraph. Indeed, public school teachers in Mississippi have no tenure and are employed under one year contracts. *Henry v. Coahoma County Board of Education,* 246 F.Supp. 517 (N.D. Miss.1963), *aff'd* 353 F.2d 648 (5 Cir. 1965) (per curiam), *cert. denied* 384 U.S. 962, 86 S.Ct. 1586, 16 L.Ed.2d 674 (1966). Furthermore, the evidence established that 75 employees, almost equally divided between white and black, were employed under such contracts, and there is no basis for believing that employment of public school teachers under the Title I program evinces racial discrimination.

Plaintiff's claim that she was discriminated against when defendants offered the vo-tech counseling job to an allegedly less qualified white person also fails. The general allocation of proof in a hiring case was established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973), wherein the Court stated:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants of complainant's qualifications.

---

**5.** Plaintiff also attacks defendants' alleged word-of-mouth hiring and promotion policy as racially discriminatory. However, as we have found that defendants advertised the vo-tech vacancy, the only position plaintiff was allegedly denied during the relevant time period, and that plaintiff was informed of the proper procedure to follow in applying for that position, we hold that she has no standing to mount such an attack. We consider *infra,* therefore, only the limited claim of failure to hire her as a vo-tech counselor, and not defendants' overall hiring and promotion policy.

Plaintiff, of course, did not apply for the position and therefore fails to meet (ii) above. Nonetheless, in *Teamsters, supra,* the Court noted that failure to apply is not a per se bar to relief. The nonapplicant, however, bears a heavy burden:

A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices. *Cf. Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 50 L.Ed.2d 471, 97 S.Ct. 568.

*Teamsters, supra,* at 367–68, 97 S.Ct. at 1870, 52 L.Ed.2d at 435.

Plaintiff did not assert any credible reason for her failure to apply for the vo-tech position and the whole evidence reflects that she lacked interest in the vacancy. The evidence affirmatively shows that no one else was hired as high school counselor, occupational orientation teacher or career awareness counselor after plaintiff ceased her employment. Accordingly, plaintiff failed to establish a prima facie case of failure to hire.

*Constructive Discharge.*

Plaintiff asserts that her rejection of the 1977–78 contract was not voluntary but rather constituted a constructive discharge by defendants. The constructive discharge doctrine has been explained by the Fifth Circuit as follows:

[I]f the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

*Calcote v. Texas Educational Foundation,* 578 F.2d 95, 97 (5 Cir. 1978) (quoting *Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (5 Cir. 1975)). The Fifth Circuit has recently held that an analysis of whether constructive discharge exists must proceed "upon an examination of the conditions imposed" upon the employee, and not on whether the employer intended to rid itself of the employee. *Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61, 65 (5 Cir. 1980). The court stated that to find constructive discharge "the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* (quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1 Cir. 1977)). In *Bourque* the court held that "discrimination manifesting itself in the form of unequal pay cannot, alone, be sufficient to support a finding of constructive discharge." *Id.* at 5363.

■ We cannot fairly conclude that a reasonable person in plaintiff's shoes would have found that the working conditions imposed by defendants compelled resignation. Plaintiff did not object to most of these conditions. As to the inclusion of a Title I paragraph in her contract, the fact that approximately 75 persons worked under such contracts, apparently without objection, belies a conclusion that this was an "intolerable" condition of employment. Plaintiff's compensation the last year of her employment in the Clarksdale public schools came from Title I funds, and, if she were in position to object to the source of funds, she is unable to show that her continuing employment as a Title I elementary counselor would have caused her any financial loss. As we stated in *Flora v. Moore, supra,* at 1118, "[w]hile the court does not sit in judgment on the subjective beliefs of an employee which may influence his or her decision to quit work, mere personal impressions, without more, cannot form the basis for relief under Title VII."

In sum, we find that plaintiff failed to establish a Title VII violation under any theory of relief.[6]

---

**6.** Our disposition of the Title VII claim obviates a ruling on the individual defendants' motion to dismiss the Title VII claim against them on the grounds that they were not named in the EEOC

*§ 1981, § 1983, Fourteenth Amendment.*

Plaintiff's complaint was filed on September 23, 1977. Defendants argue that all claims arising more than a year prior to that date are barred by Miss.Code Ann. § 15–1–29 (1979 Supp.). Our task, of course, is to determine which of Mississippi's limitation periods most appropriately fits plaintiff's claims. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295, 302 (1975).

The application of Mississippi statutes of limitation to claims arising under the Civil Rights Act has not been entirely consistent. In *Walton v. Utility Products, Inc.*, 424 F.Supp. 1145 (N.D.Miss.1976), we held that Mississippi's general six-year limitation period contained in § 15–1–49 [7] applies to actions brought under § 1981, although claims for backpay would be barred by the then three-year statute of limitations of § 15–1–29.[8] Our decision was based on the following language used by the Fifth Circuit in *United States v. Georgia Power Co.*, 474 F.2d 906, 923–24 (5 Cir. 1973), a Title VII case:

> The right to be free from discriminatory practices in employment is not analogous to the right of action on implied or unwritten contracts . . . . Indeed, it is the *failure* to contract for employment or promotion on an equal basis which gives rise to a Title VII action.

The issue of which statute applies arose again in *Heath v. D. H. Baldwin Co.*, 447 F.Supp. 495 (N.D.Miss.1977). *Heath*, like *Walton*, was a discharge case, and Judge Orma R. Smith, based on *Walton*, found § 15–1–49 to apply. In *Jordan v. Lewis Grocer Co.*, 467 F.Supp. 113 (N.D.Miss.1979), we further considered the issue. The plaintiff in *Jordan* alleged "discriminatory discharge . . . and a general policy and prac-

tice of racial discrimination by Lewis in its employment practices, including hiring, discharging, promotion and all other terms and conditions of employment." *Id.* at 115. Unlike *Heath* and *Walton*, Jordan's discharge occurred after July 1, 1976, the date on which an amendment to § 15–1–29 became effective. The amendment added a clause, and the text of that section, with the addition underscored, now reads as follows:

> Except as otherwise provided in the Uniform Commercial Code, actions on an open account or account stated not acknowledged in writing, signed by the debtor, and on any unwritten contract, express or implied, shall be commenced within three (3) years next after the cause of such action accrued, and not after, <u>except that an action based on an unwritten contract of employment shall be commenced within one (1) year next after the cause of such action accrued, and not after.</u>

The amended portion of the statute led us to conclude as follows:

> In our view, the decision of the Mississippi legislature to add the last clause and the specificity of the clause itself, *i.e.*, a limitation of its application to "unwritten contract[s] of employment," clearly evidence an intent by the legislature to provide the specific limitation statute "for actions analogous to actions based on racial discrimination in employment" which we found previously nonexistent in *Walton*. Thus, as the most appropriate state statute of limitations, § 15–1–29 provides a one-year limitation period within which a plaintiff must file suit under § 1981 after his cause of action has accrued.

*Jordan, supra,* at 117 (footnote omitted).

The Fifth Circuit recently considered the problem before us in *Truvillion v. King's*

---

charge and are not "employers" within the meaning of 42 U.S.C. § 2000e(b).

**7.** Miss.Code Ann. § 15–1–49 (1972) provides: "All actions for which no other period of limitations is prescribed shall be commenced within six years after the cause of such action accrued, and not after."

**8.** At the time Walton's suit was commenced, Miss.Code Ann. § 15–1–29 (1972) provided:

> Except as otherwise provided in the Uniform Commercial Code, actions on an open account or account stated not acknowledged in writing, signed by the debtor and on any unwritten contract, express or implied, shall be commenced within three years next after the cause of action accrued, and not after.

*Daughters Hospital*, 614 F.2d 520 (5 Cir. 1980), an appeal from the United States District Court for the Southern District of Mississippi, which dismissed Ms. Truvillion's refusal to hire claim based on the limitation period of § 15–1–29.[9] In reversing and holding § 15–1–49 applicable, the court stated:

> The [district] court reasoned that "[a] person suing under Section 1981 to enforce his right to be free of discrimination predicates his claim on the right to contract guaranteed in the statute. The contractual nature of a claim under Section 1981 dictates application of the [three year limit for enforcing unwritten contracts]." But the statutory right Ms. Truvillion asserts is not the right to enforce an unwritten contract as the district court assumed. There was no contract of any kind between Ms. Truvillion and the hospital concerning the post of laboratory technician; instead, the hospital allegedly refused for racial reasons to employ her. Ms. Truvillion relies on a statutory right to be free from discrimination. She complains of the refusal of the hospital to deal with her; she does not assert a right arising from an agreement. The complaint sounds in tort, not in contract. *Ingram [v. Steven Robert Corp.]*, 547 F.2d at 1263.[10] Because Mis-

sissippi has no statute of limitations designed to cover actions seeking redress for the tort of employment discrimination, the State's catch-all statute is applicable. *See Heath v. D. H. Baldwin Co.*, N.D.Miss.1979, 447 F.Supp. 495, 504. *Walton v. Utility Products, Inc.*, N.D. Miss.1976, 424 F.Supp. 1145, 1147. The statute runs for six years, and does not bar Ms. Truvillion's claim.

*Truvillion, supra*, at 528. The court noted, however, that a claim for back pay may be determined by the contractual statute of limitations. *Id.*, n.15. Although the court noted that § 15–1–29 was amended in 1976 to limit claims based on an unwritten employment contract to one year, *id.* at 523, n.5, it in no way indicated that its result would differ if the amendment were in effect when Ms. Truvillion's claim arose.

We need not determine whether *Truvillion* applies only to failure to hire cases, whether *Jordan* applies only when the underlying contract of employment is oral, or the effect on the application of a statute of limitation of joining several claims in one action, for the result is virtually the same no matter which analysis we follow.[11]

■ *Jordan* holds that the one-year limitation of § 15–1–29 applies to civil rights violations which occur after July 1, 1976, the effective date of the amendment.

> We think it clear that under the circumstances of this case Ingram's assertion of his rights under § 1981 and the fourteenth amendment arose independently of any agreement between him and his employer. Consequently his action was *ex delicto*, and the district court properly applied § 26.
>
> *Id.* at 1263.

**9.** Since the hospital refused to hire Ms. Truvillion in 1972, the three-year statute contained in § 15–1–29 was applied.

**10.** *Ingram*, 547 F.2d 1260 (5 Cir. 1977), involved the application of Alabama statutes of limitation to a discharged employee's § 1981 claim. The Fifth Circuit affirmed the district court's application of Alabama's one-year statute which applies to "[a]ctions for any injury to the person or rights of another, not arising from contract, and not herein specifically enumerated." Code of Ala., Tit. 7, § 26. In holding that § 26, and not the sections relating to written or implied contracts, applied to the claims, the court stated as follows:

> Our choice among these statutes will be determined by whether an action for reinstatement and back pay for the employer's discharge of an employee for constitutionally prohibited reasons constitutes an action based on contract (*ex contractu*) or on a right arising independently of the parties' agreement (*ex delicto*).

**11.** We do note that a perusal of Annot., *What Statute of Limitations is Applicable to Civil Rights Actions brought under 42 USC § 1983*, 45 ALR Fed. 548 (1979), indicates that many more civil rights actions have been held to be governed by general tort statutes of limitation than by contract statutes of limitation. In addition, we agree with the First Circuit's statement in *Walden, III, Inc. v. Rhode Island*, 576 F.2d 945, 947 (1 Cir. 1978) that the application of one statute of limitations for most if not all civil rights actions would alleviate much confusion and inconsistency.

Thus, plaintiff's claims arising after July 1, 1976, would have to be brought within one year. Since the complaint was not filed until September 23, 1977, we may consider only those post-amendment claims arising after September 23, 1976. As to those claims arising before July 1, 1976, however, *Walton* applies and the six-year statute governs. We may consider, therefore, plaintiff's claims arising from September 23, 1971, until July 1, 1976, and those arising from September 23, 1976, until the date the complaint was filed. Our exclusion from consideration of the time period from July to September, 1976, however, does not bar any of plaintiff's claims, thus the result is the same as if we had held the six-year statute applicable to all of plaintiff's claims.

■ When §§ 1981 and 1983 are used as a parallel remedy for Title VII violations, the elements of the causes of action do not differ from the Title VII requirements. *Whiting v. Jackson State University*, 616 F.2d 116, 122 (5 Cir. 1980). Our conclusion that plaintiff's Title VII claims lack merit therefore applies as well to deny recovery for the same claims asserted under §§ 1981 and 1983.

■ As to those claims asserted independently of Title VII, i.e., the § 1981, § 1983, and fourteenth amendment claims arising from September 1971 until March 1977 (the cutoff date for cognizable Title VII claims), plaintiff must establish purposeful discrimination. *Whiting, supra*, slip op. at 5106–07; *Williams v. De Kalb County*, 582 F.2d 2 (5 Cir. 1978); *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

■ The evidence indicated that the decisions made by school officials concerning the different aspects of plaintiff's employment were fairly arrived at on the basis of administrative judgment as to school needs and consistent with plaintiff's qualifications and training, and not influenced by plaintiff's race, sex or other impermissible reason.

■ Plaintiff has consistently assumed she had a right to continued employment in the Clarksdale public schools, and that the failure of the school officials to continue her in the position of high school counselor supports an inference of racial discrimination. This assumption ignores well known case law that in Mississippi public school employees are without job tenure, *Henry v. Coahoma County Board of Education, supra; Jennings v. Meridian Municipal Separate School District*, 337 F.Supp. 567 (S.D. Miss.1971), *aff'd* 453 F.2d 413 (5 Cir. 1971); and, when the employee has no reasonable expectation of reemployment, like plaintiff, who had contracts of only one year's duration, the school board may refuse to rehire the teacher for whatever reason, so long as it is not a constitutionally impermissible one. *Thompson v. Madison County Board of Education*, 476 F.2d 676 (5 Cir. 1973); *Pickens v. Okolona Municipal Separate School District*, 380 F.Supp. 1036 (N.D.Miss. 1974).

■ Nor may plaintiff rely upon the fact that Clarksdale school officials in *Hardy v. Porter*, 443 F.Supp. 1164 (N.D.Miss. 1977), *aff'd* 613 F.2d 112 (5 Cir. 1980), were held to have framed a racially discriminatory policy in employing administrators in formerly all-white schools of the district. Plaintiff has not been employed as an administrator in the Clarksdale schools or elsewhere, nor does the evidence show that she has ever sought an administrative position. The considerations governing *Hardy v. Porter* are not present in this case. Another argument advanced by plaintiff's counsel is that certain annual reports filed with the court by the school district contain errors or inaccuracies with respect to the number of class periods which plaintiff taught as counselor and other data relating to number and duties of counselors. Granted that errors have been demonstrated, we fail to see that the reports have any relevance to plaintiff's claim of discrimination. Since plaintiff totally failed to prove "that race was a substantial or motivating factor" in the employment decisions affecting her, she did not make out a prima facie case under the fourteenth amendment or §§ 1981 and 1983. *Whiting, supra*, slip op. at 5107.

*State Law Contract Claims.*

██ Plaintiff also asserts a breach of contract claim under Mississippi law for the defendants' refusal to honor the employment contract she signed as career awareness counselor in the spring of 1977 that did not contain a Title I clause. The evidence shows that such an instrument was tendered by Superintendent Ellard, who inadvertently omitted the Title I provision, and that it was his intention to employ plaintiff under the identical program by which she had been paid the previous year, 1976–77. The evidence also shows that when Ellard attempted to correct the omission, plaintiff refused to sign the revised agreement. Plaintiff can claim no enforceable contract rights under the circumstances, for she was never recommended to the school board by the superintendent and not hired by the board pursuant to his recommendation. The board refused to delete the Title I provision, and plaintiff refused to consider employment under Title I. Hence, under Miss.Code Ann. § 37–9–17 (1972), plaintiff has no rights enforceable against the school board for an instrument which never ripened into an enforceable contract, for only the board has the legal authority to hire.

In addition, the contract which plaintiff seeks to have enforced called for her services as a migrant awareness counselor, and the migrant program was cancelled before the 1977–78 school year began because of the loss of many migrant students. Even had the board approved the 1977–78 contract, it would have been incapable of performance, and plaintiff would have been without a job. Plaintiff's state law claim for breach of contract is therefore without merit and must be rejected.

*Claims for Relief.*

Plaintiff's recovery of damages, actual or punitive, for emotional distress and other losses she may have experienced as an employee of the Clarksdale school system, of course, depends upon her establishing that the defendants have violated a right protected by federal or state law. She has failed to show either that she was the victim of racially discriminatory employment policies or that defendants have engaged in tortious practices for which they owe her damages. Plaintiff has also failed to show that the school board, or any of the school officials, are guilty of breach of contract. Therefore, she must be denied all relief, including injunctive relief, monetary damages, attorney fees, and costs.